HOOD, Judge.
This is an action for damages to a building owned by plaintiff, M. B. (Paul) Dubea, which damages were caused when the building was struck by a truck. The suit was instituted against Sheppard Roy, the owner of the truck, Milbon Batiste, the driver, and Great American Insurance Company, the liability insurer of that vehicle. Judgment on the merits was rendered by the trial court in favor of plaintiff, and against Batiste and Great American Insurance Company, for $7,500.00. The two defendants who were cast in judgment have appealed. Plaintiff has an *745 swered the appeal praying that the amount of the award be increased.
The appellants do not contest the trial court’s finding as to liability, and the only issue presented on this appeal relates to quantum.
The damaged building was being occupied by plaintiff and his wife as their home, and Mrs. Dubea was operating a beauty shop in a part of the house at the time of the accident. The building is constructed of wood, and the exterior of it is covered by a stucco-type material known as “perma-stone.” It consists of seven rooms and it contains about 1800 square feet of floor space. The house was built in 1952 by plaintiff, his father and his brother, according to plans drawn by plaintiff, and it is located at a “T” intersection in the town of Marksville, Louisiana.
The accident which gave rise to the suit occurred about 3:45 a. m. on April 10, 1966. At that time a one-half ton truck, owned by Roy and being driven by Batiste, failed to negotiate a turn at the “T” intersection and the truck skidded across plaintiff’s front lawn, struck the residence building at a point near its front steps and it also struck a tree located in front of the house. The truck was being driven at a speed of about 60 miles per hour when the collision occurred. We agree with the trial judge that the sole proximate cause of the accident was the negligence of Batiste, the driver, in failing to maintain proper control over the truck he was driving.
Plaintiff contends that as a result of the accident he sustained damages in the aggregate sum of $12,487.00, of which sum $10,437.00 is for restoring the building to its former condition, $750.00 is for future loss of business of the beauty shop during restoration, $150.00 is for damages to a tree in the front lawn, and the remaining portion of the claim is for other damages allegedly caused by the accident.
The evidence shows that this residence building was damaged on other prior occasions. In 1957, it was damaged slightly by Hurricane Audrey, and plaintiff received payment for that damage from his insurer. In 1963, the insurer paid plaintiff $100.00 and replaced a television antenna because of wind damage. Later in 1963 plaintiff received $48.00 for some additional wind damage to the house. In 1965, the roof of the house was damaged by Hurricane Betsy, and the insurer had a new roof placed on it.
On May 31, 1964, and in addition to the hurricane and windstorm damages above described, plaintiff’s residence was involved in the same type of accident as that which forms the basis for this suit. On that date an Oldsmobile automobile failed to negotiate a turn at this “T” intersection, and it also skidded across plaintiff’s front lawn and ran into the front part of plaintiff’s house. Plaintiff instituted suit against Great American Insurance Company, which had insured his property against accidental loss or injury, in which he demanded judgment for $4,589.27 as the cost of repairing the damages caused to the building by the 1964 accident. In that suit he alleged that “the perma-stone exterior walls of petitioner’s residential building were damaged beyond repair, the building was knocked off its foundation and all of the supporting piers, sills, joists, floors, interior and exterior walls, windows, window frames, doors and door frames were knocked out of line or caused to sag.” Plaintiff attached to his petition a statement prepared by Sidney Lemoine, a general contractor, showing that it was necessary, among other things, to repair 12 brick piers, repair 15 floor joists, rework and repaint about 16 of the 19 windows and window frames in the house, rework and repaint 19 doors and door frames, level all of the floors (1800 square feet) and completely replace all of the perma-stone walls, this last item alone amounting to $2,800.00. That suit was settled by compromise agreement, the record showing that plaintiff received $1,500.00 from the in *746 surer in December, 1965, as a compromise settlement of the claim.
Plaintiff testified that he and his father and his son repaired the damage caused by the 1964 accident, and that the building was “back in good shape” before the 1966 accident occurred. Although he stated that the 1964 damages had been repaired, he concedes that none of the perma-stone or stucco exterior of the house has ever been repaired or replaced, that he repaired only four or five floor joists, that he did not level all of the floors but he leveled only the floors on the north side of the house and under the beauty shop, and that he replaced or repaired only “four or five, not over eight” brick piers under the house instead of the 12 piers which Lemoine felt should be repaired. Plaintiff testified that the 1966 accident caused much greater damage to the house than did the first one, that it “knocked that sill back, shoved some of the floor joists out from different positions, * * * jammed my doors and windows again and cracked my floors,” and that some of the baseboards and door frames had been separated from the walls. He stated that since the second accident some of the windows cannot be raised at all and others can be raised only partially, and that all of the doors drag. His testimony in all of these particulars was supported by that of his father, of his wife and of a maid who worked for the family.
Four experienced building contractors were qualified as experts in building and repairing houses, and each expressed an opinion as to the expenses which would be incurred in repairing the damages of plaintiff’s building. Two of these experts, Sidney Lemoine and Whitney Armand, testified in behalf of plaintiff, and the other experts, James E. Rabalais and Frank Gremillion, testified for defendants.
Mr. Lemoine inspected plaintiff’s residence building after the first accident occurred in 1964, and he prepared a statement of the damages caused by that accident with an estimate of the cost of repairing those damages, his total estimate being $4,589.27. Plaintiff used that statement as the basis for the suit which he filed following the first accident, attaching a copy of Lemoine’s statement to his petition. We have already pointed out some of the damages which he found at that time, and we have noted that some of those damages resulting from the first accident have never been repaired. Lemoine inspected the house again shortly after the second accident occurred in 1966, and at that time he concluded that it would cost $10,437.00 to make the repairs which were pointed out to him. The estimate which he submitted included the removing and replacing of some of the perma-stone exterior of the building, repairing 10 floor joists, repairing 16, brick piers, removing and restoring practically all of the windows, window frames, doors and door frames, leveling all of the floors (1800 square feet), $2,000.00 for painting, $1,500.-00 for electrical work and $225.00 for plumbing.
Mr. Armand concluded that it would cost $10,585.27 to make the repairs which were pointed out to him by plaintiff. His estimate included substantially the same items which were listed by Mr. Lemoine, including $2,000.00 for painting, $1,500.00 for electrical work, $105.00 for plumbing repairs and $700.00 additional for damages which were not apparent but which might be discovered while other repairs are being made.
Mr. Rabalais, one of the experts called by defendants, had been appointed by the court in 1965 to serve as an “umpire” in appraising the damages which were caused by the first accident in 1964, and on that occasion he estimated that the cost of repairing those damages would be $1,500.00. The case was settled for the exact amount of the appraisal made by Rabalais. He appraised the damages to the house again *747 after the second accident occurred in 1966, and he estimated that it would cost $4,-948.00 to repair all of the damages which he observed at that time. Of this amount he felt that $2,637.00 represented the cost of repairing damages which were caused by the 1966 accident, and that the remaining sum of $2,311.00 represented the cost of making other repairs which he could not attribute to that accident, although he stated that they were brought about by causes other than ordinary wear and tear. He stated that some of the repairs which he could not attribute to the accident possibly could have been caused by a truck running into the front of the house, but that they could also have resulted from normal settlement or expansion or contraction of the building. He explained that the only “cracks” in the oak floor which he found or which were pointed out to him, other than at one place near the front door where the floor was buckled, were at points where the ends of two oak flooring boards were joined together, and he felt that these very minute cracks could not have been caused by an accident at all, but were due to the fact that the ends of those boards were not driven closer together at the time the floor was laid. He found that not a single window was broken, including the large plate glass window located within a very few feet from the place where the truck struck the house, and that none of the sheetrock in the house was cracked or damaged except in one place in the front wall of the living room, at about the point where the truck hit the house. He also pointed out that the unevenness of the floor in a hall near the center of the house was caused by the fact that the walls of that hall were not located on sills, and that the weight of the walls caused the floor to sag where they rested on the floor. He stated that this condition existed when he first inspected the house before the 1966 accident, and we note that the floor in this portion of the house was not leveled by plaintiff after the first accident.
Mr. Gremillion also inspected the house on two occasions, the first inspection having been made after the 1964 accident and the second after the 1966 accident. He estimated that the expense of repairing the damages occasioned by the first accident would have been $491.29, and that the cost of repairing the damages occasioned by the 1966 accident would be $2,202.23. He included in his last estimate only those damages which he felt certain were actually caused by the 1966 accident.
The trial judge found that “the first collision damage had been repaired, except for the perma-stone cracks at the front of the building.” He noted that he was impressed by the testimony of Mr. Lemoine as to the costs of the repairs, but he rejected that part of the latter’s estimate which included $1,500.00 for electrical work and $2,000.00 for repainting and refinishing. He concluded that an award of $7,-500.00 should be made to plaintiff, taking into consideration the fact that Mrs. Du-bea’s beauty shop would have to be closed during the repairs and the family would have to vacate the premises.
The conclusions of fact reached by the trial judge are entitled to great weight, especially when those conclusions are based upon an evaluation of the credibility of the witnesses, and his findings of fact will not be disturbed unless found to be clearly erroneous. Martin Timber Company v. Taylor, 187 So.2d 196 (La.App.3d Cir. 1966). With this established rule in mind, we accept the finding of the trial judge that the first collision damage had been repaired before the second accident occurred. We, however, interpret the trial court’s finding to be that plaintiff made the repairs which he said he made. We do not interpret the trial judge’s holding to be that plaintiff made all of the repairs which Mr. Lemoine had felt were necessary, or that he made any more repairs than he testified had been made. Also, in view of the trial court’s findings, we feel that the opinions ex *748 pressed by Mr. Lemoine as to the cost of repairing the damages should be given much weight.
A review of Mr. Lemoine’s testimony reveals, however, that he clearly emphasized the fact that when he inspected the house following the 1966 accident he made no attempt to determine what damages had been caused by that accident. He simply estimated the cost of repairing all of the damages or defects in the house which plaintiff pointed out to him as needing repair, regardless of the cause of those conditions. He testified that “We went strictly by what Mr. and Mrs. Dubea indicated to us as damages, room by room, wall by wall,” and that “I don’t know what caused it.” He stated that while making his second inspection of the house he didn’t pay any particular attention to whether the damages which he found on his first inspection had been repaired, and that his estimate as to the cost of making repairs after the 1966 accident was “based on everything in the house that was pointed out * * * that needed repairing.” He conceded that the unleveling of the floors of a house can occur by slipping or sinking of the pillars under the building, and he stated, “I don’t know that that occurred in that house; I don’t know that.”
Mr. Armand, plaintiff’s other expert, also testified that he made no attempt to determine whether the damages or defects in the house which were pointed out to him by plaintiff had been caused by the 1966 accident. He testified, “I don’t know what did it, but it needs to be done,” and he stated that he is sure some of the damages he proposed to repair were caused by “ordinary wear and tear,” but “most of it not.”
We think it is obvious from the evidence that some of the damages which Mr. Le-moine found on his second inspection of the house are the same conditions which he found when he first inspected it. For instance, on his first inspection he found that 12 brick pillars had been damaged as a result of the 1964 accident. Plaintiff concedes that he repaired only three or four, and not more than eight, of these piers. On Lemoine’s second inspection of the house in 1966, he found that 16 brick piers needed repair. It is apparent, therefore, that the damages to some of the brick piers which he found in 1966 were caused by the first accident, rather than the second. Also, after the first accident, Mr. Lemoine stated that it was necessary to level 1800- square feet of floor space, including the unevenness in the floor of the hall near the center of the house. Plaintiff admits that he has not leveled all of the floors in the house since that time, and particularly that he has not leveled the hall floor near the center of the building. After the second accident, Mr. Lemoine again recommended that 1800 square feet of flooring be leveled, and since some of the same unevenness existed and was not corrected before the 1966 accident it is apparent that all of that particular item of repair could not be attributed to the second accident.
Mr. Rabalais and Mr. Gremillion, on the other hand, related each item of repair which they recommended to the 1966 accident, and the estimates which they made included repairs which they felt were caused or may have been caused by the 1966 accident.
In view of the fact that the two appraisers called by plaintiff made no attempt to determine what damages had been caused by the 1966 accident, but merely estimated the cost of repairing all defects in the house which were pointed out to them by the plaintiff, we feel that the trial court erred in accepting the estimates made by those appraisers as establishing the cost of repairing the damages caused by that particular accident. The experts called by defendants did endeavor to ascertain the damages which were caused by the 1966. accident, and to estimate the cost of repairing those damages. Since the opinions expressed by the two last mentioned experts-constitutes the only evidence in the record *749 as to the cost of repairing the damages which actually were caused by the 1966 accident, we feel that we must accept their testimony in preference to that of plaintiff’s experts. Considering the trial court’s finding that plaintiff made extensive repairs to his home after the 1964. accident, we conclude that all of the damages found by Mr. Rabalais, including those which he could not definitely attribute to the 1966 accident, were caused by the second accident, and that plaintiff thus is entitled to an award of $4,948.00 for the damages caused by the second accident. The award made by the trial court will be reduced to that amount.
We think the evidence fails to establish that the tree in plaintiff’s front lawn was damaged. Also, plaintiff had failed to show that there will be a loss of business of the beauty shop during restoration of the building. Neither Mr. Rabalais nor Mr. Gremillion have suggested that plaintiff will have to vacate the premises while the repairs caused by the 1966 accident are being made. But even if it should be necessary for the house to be vacated during that time, Mrs. Dubea testified that operating the beauty shop was only a part-time business, that her average earnings were thirty to thirty-five dollars per week from it, and that if she is compelled to move to another location, “some customers may go elsewhere and may come back.” The evidence, we think, fails to establish that there will be a loss of income from the beauty shop as a result of the 1966 accident.
For the reasons herein assigned, the judgment appealed from is amended by reducing the amount of the award to plaintiff from $7,500.00 to the sum of $4,948.00. As thus amended, the judgment appealed from is affirmed. The costs of this appeal are assessed to plaintiff-appellee.
Amended and Affirmed.